## THE OCEAN PRINCE.

### PRINCE STEAM SHIPPING CO. *v.* LEHMANN *et al.*

*(District Court, S. D. New York.* April 12, 1892.)

CONSTRUCTION OF CHARTER-PARTY—"BAD WEATHER"—"DISPATCH MONEYS."
The words "bad weather" in the charter in this case, must be construed to include weather not fit or reasonably safe for loading by reason of the state of the sea as well as of the atmosphere; dispatch moneys computed accordingly.

In Admiralty. Libel for freight under charter. Counter-claim for dispatch money.

The steam-ship Ocean Prince loaded a cargo of iron ore at Elba, where there is no harbor, but only an open roadstead, in consequence of which the ore was furnished to the ship in lighters. There was a conflict of testimony between the master of the ship and the agent of the shipper as to whether during certain days during which no cargo was furnished the ship the weather was bad or not. The clause of the charter referring to the weather was as follows:

"The act of God, restraint of princes and rulers, strikes of miners or workmen, *bad weather*, quarantine, riots, Sundays, holidays, frosts, stoppage of trains or mines, accidents to machinery, etc., and all unavoidable accidents, and all causes beyond the control of the shippers, charterers, or the consignee, which may prevent or delay the loading or discharging, always excepted."

For prior report, see 39 Fed. Rep. 704.
*Butler, Stillman & Hubbard*, for libelant.
*Benedict & Benedict*, for respondents.

BROWN, District Judge. The amount of freight, $3,913.27, is not disputed. The charter allowed for the loading and discharge at the rate of 250 tons per day during working days; Sundays, holidays, *bad weather*, etc., being excepted; and it provided for a credit to the charterer of £15 per day, dispatch moneys, for any time saved upon the above allowance. Computation upon the amount of cargo gives an aggregate time allowance of 8 days and 5 hours for loading and the same for discharging. The respondents claim to have used but 5 days 18½ hours in all, and claim a credit, therefore, at the stipulated rate, for the balance of the lay-days. The principal question turns on the meaning of the term "bad weather" in the charter, and upon the actual condition of the weather while the vessel was loading by means of lighters three-quarters of a mile from the jetties, at the island of Elba, in the Mediterranean.

From the evident general intent of the charter, and from the immediate context of the words "bad weather," they must be construed to include, I think, weather not fit for loading or unloading by reason of the state of the sea as well as of the atmosphere. The entries in the master's log, and his testimony, show that he constantly used the phrase in that sense. "Bad weather," as used in the charter, means not merely weather during which cargo could not by any possibility have been

loaded, but such weather as was not reasonably fit or proper. This would exclude days when it was not reasonably safe to attempt loading with the appliances at hand, and when under the practice of the port loading was customarily suspended for that reason by competent men intrusted with the work, and acting upon their judgment of the fitness and safety of loading.

The master of the ship, and the superintendent of the loading, differ considerably as to the days they consider to have been fit for loading. The superintendent, however, was constantly engaged in the business of loading, was upon the spot, and his testimony as to each day relates to the condition of the sea in the shallow water near the jetties, where the lighters were obliged to take their loads from the beach. The master did not go to the jetties at all, though he went ashore almost daily at other points. The superintendent's testimony, therefore, seems entitled to the most weight. That the judgment of the men employed to load was fairly exercised, is confirmed by the further fact, to which the superintendent testifies, that other vessels that were loading at the same time and place, suspended loading during the same time that loading on the libelant's vessel was suspended on account of bad weather. The master, however, testifies positively that loading was going on upon the 28th day of December from 9 o'clock until 4; while the superintendent allows but four hours, saying that the rest of the time was bad. In this respect the master's record is most precise, and the respondents must be charged with the time that they actually worked. Computing the rest of the time upon the basis of the superintendent's testimony, I find the respondents chargeable with 5 days in loading and 1¾ days in discharging, making a saving, out of the 16 days and 10 hours allowed her, of 9¾ days, which, at the stipulated rate of £15 per day, entitles the respondents to a reduction of $679.80. Decrees may be entered accordingly.